IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**DAVID ERIC LYNCH,**
      **Petitioner,**

**v.**                                        **Case  No.   3:05cv38/RS/MD**

**JAMES V.  CROSBY,**
      **Respondent.**

_____

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed pursuant to Title 28 U.S.C. § 2254 (doc. 1).  Respondent has filed a response (doc. 11), including relevant portions of the state court record (doc. 12).  Petitioner has replied (doc. 16). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla.  Loc.  R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).   It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

## GENERAL BACKGROUND[1]

The Federal National Mortgage Association (Fannie Mae) and The Federal Home Loan Corporation (Freddie Mac) buy and sell mortgage loans. They are nationally chartered corporations but they are not agencies of the United States, and cannot pledge its credit. As part of their operations they assemble and sell, through various underwriters, collateralized mortgage obligations (CMOs), a form of "derivative" based on income streams from mortgage payments. These obligations take various forms, but as a general rule are risky as investment vehicles. For example, a CMO may be well collateralized by existing mortgages when it is created, but there is no guarantee that the underlying debts will be paid, or that they will not be paid off before maturing, such as through refinancing or by the sale of the mortgaged property. If a CMO depends for its value on interest income from existing mortgages (as some do), that income will decrease when an underlying debt is paid off, resulting in devaluation of the CMO. There are many types of CMOs, all with their own kinds of rewards and risks. CMOs are volatile, and their value depends on many factors. The true market value of a particular CMO at any moment is extremely difficult to determine, in large part because they are not widely traded. Nevertheless, some investors find them attractive because, in spite of high risk, they provide the possibility of high return.

First Montauk Securities Corporation, a national full service brokerage firm, opened an office in Houston, Texas. Petitioner and Joel Hurst, along with others, were placed in the Houston office, with petitioner and Mr. Hurst as co-managers. The two also acted as salesmen, selling securities using First Montauk as broker. Beginning in the spring of 1993, and continuing through the fall of 1994, petitioner,

---

[1]The following general outline of the factual background of this case comes from the facts presented at trial and viewed in the light most favorable to the prosecution. Where there are conflicting inferences and where disputes exist, this Court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution. *Martin v. State of Alabama*, 730 F.2d 721, 724 (11th Cir. 1984). Much of the factual background is also taken from the decision of the Florida First District Court of Appeal in *Black v. State*, 819 So.2d 208 (Fla. 1st DCA 2002), in which it affirmed the conviction of one of petitioner's co-defendants. Specific reference to the pages of the record or to the *Black* decision will be made, where appropriate, in the discussion portion of this report and recommendation. The *Black* decision gives a complete description of the types of securities involved and the manner in which co-defendants dealt with them.

Joel Hurst, Kent Black, and Larry Muller (the co-defendants) created and operated a scheme to earn handsome commissions on the sale of CMOs. Through First Montauk, they would acquire all, or essentially all, of a "tranche" or class of a CMO issue from its underwriter, and then sell it or parts of it to selected clients whose trust they had developed. Particular clients identified at trial were the City of Painesville, Ohio, National Guardian Insurance Company, Our Lady of the Lake Regional Medical Center, Mr. Gary Towler, Mr. Lester Colodny, and Escambia County, Florida. The co-defendants either sold the CMOs directly to these customers, or "rolled" them through other brokerage firms.

The essence of the scheme was to capture an entire series of a CMO, presumably at its market value, from the Fannie Mae or Freddie Mac underwriter, and then sell it to a customer with sufficient mark-up to create a commission for First Montauk and the co-defendants. The sale would come with a promise (although not in writing) to re-purchase the CMO from the customer after a certain period, typically 90 days, or on demand of the customer. While the customer owned the CMO, interest income would be paid, typically monthly. The CMO would then be re-purchased (based in some instances on false advice that its value was about to decline), thereby generating additional commissions. It would then be sold to another customer at a higher price, with more commissions. Thus, a particular CMO might pass through four or five customers. Each customer would presumably be satisfied, because they earned income from the investment while they owned it, and re-sold it with a gain, or at least without a loss.

Evidence at trial showed, without contradiction, that this scheme proceeded during a time that the market value of CMOs generally was in significant decline. The co-defendants were able to sell to their customers at ever increasing prices because the true market value of the CMOs they were selling could not be ascertained by reference to any published materials. The customers trusted their broker, and had no idea that they were buying CMOs at ever increasing prices, all without any relevance to their true value. Since the co-defendants had purchased (through First Montauk) the entire class of a CMO, the class would not trade

anywhere else, and the only market was the one created by the scheme.  Thus, the values of the CMOs being traded by the co-defendants were not set by the market, but by the co-defendants.  During the period of the scheme, the co-defendants individually were paid substantial commissions, including commissions from trades with Escambia County.

## BACKGROUND RELATING TO ESCAMBIA COUNTY, FLORIDA

As part of his usual sales duties  Mr.  Black placed a "cold call" from Houston to Mr. Joe Flowers, who was the Comptroller of Escambia County, and was responsible for investing its liquid assets.  Mr.  Flowers expressed an interest in safe, secure investments yielding a fair return, and sent Mr.  Black a copy of the County's written investment policy.  The policy emphasized protection of principal, diversification, and liquidity, with the target of exceeding the higher of the return on three month Treasury bills or the average rate on federal funds.  Mr. Black accommodated the county, and initially sold it bonds issued by various federal agencies, all in keeping with the county's expressed investment policy. In mid-1993 Mr.  Black started recommending various CMOs, assuring Mr.  Flowers that they were secure investments in keeping with the county policy, and that they were federally issued securities and therefore federally guaranteed.  In all, Mr.  Black, through First Montauk, sold (and repurchased from) the county seven different CMOs a total of eleven times.

What the co-defendants had created, therefore, was a sort of reverse pyramid scheme, and as with all pyramid schemes, there came a time of reckoning.  That time came when various national news media began carrying stories about the risks of owning derivatives (such as CMOs).  Out of concern for what he was learning from the media, Mr. Flowers informed First Montauk that the county wanted to sell back its CMOs at the "agreed" price.  First Montauk refused to buy, contending that it had no legal obligation to repurchase, since there was no written undertaking for it to do so.  First Montauk thus effectively disavowed anything done by the co-defendants. Escambia County was forced to liquidate its CMO holdings at a loss of

just over $3 million, which was mitigated to some degree by the receipt of $1.25 million in monthly payments the County received while it held the CMOs.  This latter figure could be further discounted by what the county would have earned had it been investing in appropriate investment vehicles.  Regardless, the county suffered a significant loss.

## THE CHARGES

The co-defendant's were charged by information in the Circuit Court of Escambia County with three separate state offences, summarized as follows:

COUNT ONE (the conspiracy count):  While employed by or in association with an enterprise, conspiring to violate the Florida RICO Act, Fla. Stat. §§ 895.03 (3)[2], by engaging in a pattern of racketeering activity, with the intent of engaging in two incidents of racketeering, or participating in the enterprise knowing that other members of the conspiracy would do so, all in violation of Fla. Stat. §   895.03(4).[3]   The predicate acts comprising the pattern of racketeering activity consisted of two or more violations of the Florida Securities and Investor Protection Act, Fla. Stat. §  517.301.[4]  Count One set out the specifics of the conspiracy between the co-defendants outlined in the general background above, including purchasing CMOs, selling them at non-market rates, and giving false information on their true value and risk, among other things.

COUNT TWO (the first substantive count):  While employed by or associated with an enterprise (First Montauk), engaging in a pattern of racketeering

---

[2]This section makes it unlawful for any person employed by or associated with any enterprise to conduct or participate in such enterprise through a pattern of racketeering activity.

[3]This section makes it unlawful for any person "to conspire or endeavor to violate" any of the substantive provisions of the Florida RICO Act, including § 895.03(3).

[4]This section makes it unlawful for a person to employ a scheme or artifice to defraud in connection with rendering investment advice for the sale or purchase of a security.

activity in violation of the Florida RICO Act, Fla. Stat. §§ 895.03(3). The predicate acts comprising the pattern of racketeering activity consisted of two or more violations of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301. Count Two set out the specifics of the sale and repurchase of various CMOs to and from Escambia County, and the giving of false information regarding their true market value and risks, among other things.

COUNT THREE (the second substantive count): Engaging in a scheme to defraud more than $50,000 in violation of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a)(1).[5] Count Three alleged generally that the co-defendants defrauded Escambia County of more than $50,000 by falsely representing that the CMOs were suitable investments, knowing that they were risky, volatile, and unsuitable in light of Escambia County's investment policy; falsely representing that the CMOs were being sold at market prices; and falsely representing that the CMOs were government securities guaranteed by the United States.

(Doc. 12, ex. A).[6]

## PROCEDURAL HISTORY

The case was tried to a jury over a four week period in February and March of 1998. All four defendants were found guilty on all charges. Petitioner was sentenced to 78.5 months imprisonment on each count, concurrent . He appealed his conviction and sentence. The appellate court affirmed, relying on *Black v. State,* 819 So.2d 208 (Fla. 1st DCA 2002) (affirming conviction of co-defendant Black)(ex. G). Petitioner then filed a petition for writ of habeas corpus in the appellate court, claiming ineffective assistance of appellate counsel (ex. I), which was denied without written opinion (ex. J). Petitioner next filed a motion for post-conviction relief

---

[5]This section makes it unlawful for any person to engage in a scheme to defraud and thereby obtain property of a value of greater than $50,000.00. The amount determines the maximum penalty.

[6]Hereafter all references to exhibits will be to doc. 12 unless otherwise noted.

pursuant to Fla.R.Crim.P. 3.850 in the trial court (ex. K), which was denied by written opinion by the trial judge, without an evidentiary hearing (ex. L). The order denying the motion for post-conviction relief was affirmed without written opinion (ex. M). Petitioner then filed a second petition for writ of habeas corpus in the appellate court, again claiming ineffective assistance of appellate counsel (ex. P), which was "denied on the merits." (Ex. Q).

Petitioner now brings this federal habeas petition. He raises ten claims of ineffective assistance of trial counsel, one claim of ineffective assistance of appellate counsel, and one claim of denial of due process alleging lack of jurisdiction and prosecutorial misconduct.

Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring). Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable. More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172. The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20). The Supreme Court has clarified that "[a]voiding these pitfalls does not require

citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  *Holland v. Jackson*, 542 U.S. 649, 652, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims.  *Neelley*, 138 F.3d 917.  Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication  "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that:  "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be

presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

The respondent concedes that the instant habeas petition is timely.  He further concedes that most of the claims raised were properly exhausted.  Where exhaustion is an issue, that concept will be discussed in detail.  Therefore, the court will address the issues as presented under the standard of review discussed above.

## PETITIONER'S GROUNDS FOR RELIEF

**GROUND ONE - Ineffective assistance of counsel.**

As noted above, plaintiff presents ten separate grounds for relief (here sub-sections A - J) based on ineffective assistance of trial counsel.

Clearly established federal law.

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance."  *Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314.  "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994).  In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting

effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

*Chandler* at 1314 (footnote omitted). Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment. *Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

**Federal review of state court decision.**

> A.    **Ineffective assistance of counsel - failure to develop a good faith reliance defense.**

For his first ground for relief petitioner contends that the securities industry is highly regulated by both federal and state authorities; that First Montauk had specific rules requiring its approval of all transactions carried out in its name, including the sale of the CMOs involved here; and that First Montauk's general counsel, Robert Rabinowitz, and its compliance officer, Brian Cohen, together or singly, approved every transaction involved in the alleged conspiracy.   Thus, petitioner asserts that his trial counsel should have raised the defense of good faith reliance.   Petitioner raised this claim in his motion for post-conviction relief.   The state court applied *Strickland* (as construed by the Florida Supreme Court in *Torres-Arboleda v. Dugger*, 636 So.2d 1321, 1324 (Fla. 1994)), and held that the claim was meritless.   It found that under Florida law, good faith reliance on advice from counsel and ignorance of the law are not defenses to violations of Fla. Stat. §§ 517.301 or 817.304, which are not specific intent crimes (ex. L, pp. 104-05).   The court also held that petitioner had not adequately pleaded his claimed reliance. Specifically, the court found that petitioner had not indicated what inquiries he had made of counsel, what specific advice he had received, or even the name of counsel. Moreover, when petitioner claimed that he was relying on the practice of First Montauk to approve the legality of all transactions, this gave rise only to an inference that the transactions were legal, not that they actually were.   The Florida First District Court of Appeal affirmed the denial of relief.

        Petitioner's argument that the state court unreasonably applied *Strickland* obviously depends upon this court determining counsel's performance was deficient, but first this court would have to conclude that the state court misinterpreted state law.  In *Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338 (11th Cir. 2005) and *Callahan v. Campbell*, 427 F.3d 897 (11th Cir. 2005), the Eleventh Circuit addressed similar issues.   In *Herring*, the petitioner argued his counsel was ineffective for failing to make an objection, based on state law, to the introduction

of non-statutory aggravating evidence at the penalty phase of his trial. *Id.* at 1354-55. The Florida Supreme Court concluded that the proposed objection would have been overruled and therefore counsel was not deficient. *Id.* The Eleventh Circuit held: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Id.* (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Similarly, in *Callahan*, the petitioner contended his counsel was ineffective for failing to argue that, based on the Alabama state courts' interpretation of the Double Jeopardy Clause in three state court cases (*Hull v. State*, 607 So.2d 369 (Ala. Crim. App. 1992), *Ex parte Hergott*, 588 So.2d 911 (Ala. 1991), and *Ex parte Callahan*, 471 So.2d 463 (Ala. 1985) (*Callahan I*)), the introduction of petitioner's statements at his second trial was precluded. The Alabama Court of Criminal Appeals concluded that the petitioner's claim relied on an erroneous interpretation of state law and rejected it. The Eleventh Circuit held:

> [T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected to the introduction of [petitioner's] statements based on *Callahan I*, *Hull*, and *Hergott* -- the objection would have been overruled. *Callahan* [*v. State*], 767 So.2d [380,] 386-87 [(Ala. Crim. App. 1999)] (*Callahan III*). Therefore, [petitioner's counsel] was not ineffective for failing to make that objection.
>
> Moreover, we are convinced [petitioner] could not satisfy the prejudice prong of *Strickland*. [Petitioner's] ability to demonstrate prejudice is again foreclosed by the state court's decision in *Callahan III*. Even if [petitioner's counsel] was ineffective for failing to make the objection, the state court has told us that if he did make the objection it would not have been successful. [Petitioner] cannot be prejudiced by his counsel's failure to make a losing objection.

427 F.3d at 932.

Here, as in *Herring* and *Callahan,* the Florida First District Court of Appeal has answered the question of what would have happened had petitioner's counsel

mounted a good faith reliance defense -- it would not have been allowed.  Therefore, counsel cannot be faulted for having failed to raise it.  Moreover, petitioner cannot be prejudiced by his counsel's failure to mount a defense that was not allowed by state law.

Even if the law in Florida were different, petitioner still would not prevail.  He did not tell the state court, nor has he told this court, what inquiries he made of counsel or what specific advice he received.  In his reply brief petitioner argues that he had two different reliance defenses: reliance on counsel and reliance on the administrative procedure set up by First Montauk.  He fails, however, to show that there is any practical difference between the two.  At most he says that his activities passed through the First Montauk compliance department.  That smacks more of a statement that he didn't get caught by the compliance department than that he made a full disclosure of his activities and received approval.  Petitioner therefore cannot show ineffective assistance of counsel, either as to performance or prejudice, and he is not entitled to federal habeas relief on that ground.

> B.    Ineffective assistance of counsel - Failure to move for judgment of
>        acquittal on "suitability charge."

Petitioner next contends that his counsel was ineffective when he failed to move for a judgment of acquittal because the state relied on the lack of "suitability" of the CMO's sold to Escambia County.  He says that suitability is a legal concept contained in National Association of Securities Dealers (NASD) Rules, and put the burden on First Montauk, not on petitioner, to determine the suitability of an investment.  Therefore, he says, all he was charged with was a regulatory violation.  The trial court disagreed, holding that the amended information specifically charged petitioner with state criminal violations (exh. L, p. 2).  The Florida First District Court of Appeal affirmed.

The common thread in the conspiracy count and the first substantive count were violations of Fla. Stat. § 517.301, which makes it unlawful to employ a scheme or artifice to defraud in connection with rendering investment advice for the sale or

purchase of a security.[7]   The state court, construing state law, held that the Information charged the crimes appropriately, and that the charges were not administrative in nature.  This court defers to the state court determination.

Moreover, mere use of the word "unsuitable" in the Information did not change the charge into an administrative one, or incorporate federal legal descriptions into the case.  Advising Mr. Flowers that the investment was suitable, when in fact it was not, was part of the basis for the state's case that petitioner defrauded the county.  Moreover, it was only one part.  The state also alleged, and proved, that petitioner misrepresented the volatility, liquidity, value, and risks of the CMOs, among many other things.  Petitioner's picking the word "suitable" out of the Information and making it into something it isn't is a red herring.

The second substantive count alleged a violation of Fla. Stat. § 817.034(3)(c)3.[8]  This section makes it unlawful to employ a scheme to defraud and

---

[7]That statute reads in relevant part:

517.301. Fraudulent transactions; falsification or concealment of facts

(1) It is unlawful and a violation of the provisions of this chapter for a person:

(a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

* * *

[8]That statute reads in relevant part:

817.034. Florida Communications Fraud Act

* * *
(4) Offenses.--

(a) Any person who engages in a scheme to defraud and obtains property thereby is

thereby obtain property of a value of greater than $50,000.00.  Again, the many misrepresentations made to Mr. Flowers included the incorrect fact that the investment was suitable for Escambia County, when it clearly was not.  It would have been futile for counsel to have moved for a judgment of acquittal on this theory.  The state court's adjudication of this ground did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra*.  Petitioner is not entitled to federal habeas relief, and the writ should not issue.

C.   Ineffective assistance of counsel - Failure to move for acquittal on lack of jurisdiction.

Plaintiff's second contention on his counsel's failure to move for judgment of acquittal deals with jurisdiction.  He says that because the transactions with which he personally was involved did not occur in Florida, he should not have been found guilty.  Petitioner presented this claim in his motion for post-conviction relief, and the court pointed to *Black v. State, supra*, which addressed the question directly.  The *Black* court held that Florida had jurisdiction over Mr. Black's activities under the state's long-arm statute, because the activities of the conspiracy and the scheme to defraud had the effect of fraudulently obtaining money in Florida.

Petitioner has not favored this court with any authority on the issue other than the general observation that the three charges were based on securities that were sold outside of Florida (doc. 1, p. 4-D).  Petitioner did not discuss this issue in his reply brief (doc. 16).  It is noteworthy that only Mr. Black dealt directly with Mr. Flowers, so his dealings can easily be seen as occurring in Florida.  Petitioner here did not deal with Mr. Flowers, but he was part of the conspiracy that did so (Count One), he engaged in a pattern of racketeering that had effects in Florida (Count Two)(selling CMOs at ever increasing prices before they were ultimately sold in

---

guilty of organized fraud, punishable as follows:

1. If the amount of property obtained has an aggregate value of $50,000 or more, the violator is guilty of a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Florida, as well as participating in receipt of the commissions derived from the Florida sales), and he engaged in a scheme to defraud (Count Three)(same).  It was not the individual sale of a particular CMO that snared this petitioner.  It was his participation in the entire scheme that resulted in Escambia County (among others) paying non-market prices for securities that were unsuitable for its investing purposes and were not, as the group maintained, liquid, government-backed, or non-volatile.  The facts showed that this petitioner shared in the commissions received from these various transactions, so there was proof that he was part of the conspiracy.  Florida's long-arm statute makes it unlawful to conspire outside the state to commit a crime that takes place within the state.[9]  The state court held specifically that this statute controlled the facts of this case.  Counsel was accused of ineffectiveness, but as before, the alleged ineffectiveness was based on petitioner's incorrect interpretation of state law.  The Florida courts have construed their law, and this court defers to that construction.  Had counsel moved for a judgment of acquittal on the basis proposed by petitioner, the motion would have been denied.  Therefore, counsel was not ineffective for failing to make that motion.  Moreover, even if counsel was ineffective for failing to make the motion, the state court has told this court that had counsel made the motion it would not have been

---

[9]That statute provides, in part:

910.005. State criminal jurisdiction

(1) A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is legally accountable, if:

(a) The offense is committed wholly or partly within the state; * * *

(c) The conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state; * * *.

(2) An offense is committed partly within this state if either the conduct that is an element of the offense or the result that is an element, occurs within the state. In homicide, the "result" is either the physical contact that causes death, or the death itself; and if the body of a homicide victim is found within the state, the death is presumed to have occurred within the state. * * *.

successful.  Petitioner cannot be prejudiced by his counsel's failure to submit a losing motion.

The state court's adjudication of this ground did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*.  Petitioner is not entitled to federal habeas relief, and the writ should not issue.

D.      <u>Ineffective assistance of counsel - Failure to move for judgment of acquittal where Count One of the Information alleged a conspiracy to "attempt" a crime.</u>

Petitioner next contends that counsel should have moved for acquittal because the first count charged petitioner with conspiring to *attempt* a crime ("came to a mutual agreement or understanding to try to accomplish a common and unlawful plan, namely to engage in a pattern of racketeering activity"), which is not a crime in Florida.  The trial court denied relief, holding that the quoted language in the conspiracy count merely described the purpose or object of the conspiracy, not a separate crime.  The Florida First District Court of Appeal affirmed the denial order.

Petitioner has selectively picked language out of a lengthy information that charged him with conspiracy.  The Information indeed alleged that petitioner came to an agreement with others to try to engage in racketeering, but the same Information went on to describe in some detail how the conspiracy was successful in achieving its agreed aims.  Petitioner was not charged with conspiring to attempt a crime; he was charged with conspiring to commit one.  The state proved both the conspiracy and the underlying criminal acts, and the state court held that this was sufficient under state law.  Here, as in *Herring, supra* and *Callahan, supra*, the state court has told this court how the issue would have been resolved under Florida state law had trial counsel moved for judgment of acquittal on the basis urged by petitioner -- the motion would have been denied because the acts described in Count One, when taken as a whole, constituted a crime under Florida law - the crime of conspiring to violate the Florida RICO Act.  Thus, petitioner cannot satisfy the deficient performance and prejudice prongs of *Strickland*.  The state court's ruling

did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*. Petitioner is not entitled to federal habeas relief, and the writ should not issue.

E. <u>Ineffective assistance of counsel - Failure to move for judgment of acquittal on failure to prove existence of racketeering enterprise.</u>

Petitioner next contends that the state failed to prove the existence of a "racketeering enterprise," and that his counsel should have moved for judgment of acquittal, at least on the first two counts. Petitioner contends that under federal law a racketeering enterprise is a criminal network engaged in racketeering activities, citing *United States v. Zielie*, 734 F.2d 1447 (11th Cir. 1984), and that no racketeering enterprise was proven in this case. This issue was raised in petitioner's motion for post-conviction relief, and was rejected by the trial court, which noted that the argument was effectively foreclosed in petitioner's direct appeal when his conviction was affirmed based on *Black v. State*, *supra*. The *Black* court addressed this issue specifically, and held that under Florida law, the state needed only to prove the existence of an ongoing enterprise, not a "racketeering enterprise." In *Gross v. State*, 765 So.2d 39 (Fla. 2000) the Supreme Court of Florida held that under the Florida RICO statute the state needs to establish only two elements: "(1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." 765 So.2d at 45. Specifically, the organization itself need not be a criminal one. The *Black* court held that the state had proven the necessary elements in this case. The Rule 3.850 court found that counsel was not deficient for failing to move for acquittal on the basis urged by petitioner. The Florida First District Court of Appeal affirmed.

Again, the state courts have already answered the question of how the issue would have been resolved under Florida state law had petitioner's counsel moved for a judgment of acquittal on the grounds that the state failed to prove existence of

a racketeering enterprise -- the motion would have been denied.[10]   Therefore, petitioner's trial counsel was not ineffective for failing to submit that motion, *see Herring v. Secretary, Dep't of Corrections*, *supra*; *Callahan v. Campbell*, *supra*.  The state court's denial of relief did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*.

To the extent petitioner now seeks to undermine the state court's interpretation of its own laws by relying on the *Zielie* decision, a federal case, he still is not be entitled to relief.  First, the *Zielie* decision does not support his claim.  In *Zielie* the question before the court was whether a convicted defendant's property could be forfeited.  The defendant argued that the government had not proven the predicate for forfeiture, participation in an enterprise that affects interstate commerce.  The defendant contended that because the drug ring involved in his case was not a *legal* enterprise, there was no enterprise.  The court rejected that argument, noting the Fifth Circuit's decision in *United States v. Martino*, 682 F.2d 965 (5th Cir. 1982), which held that an enterprise under the federal RICO statute could be "'an association in fact rather than a legal entity.'"  734 F.2d at 1458 (quoting *Martino*, 682 F.2d at 958).  Thus, the enterprise under federal law could be either a legal one or an informal one.

Second, and obviously, a federal court's interpretation of the federal RICO statue is irrelevant.  Petitioner was not prosecuted under federal law.  Rather, he was

---

[10]The necessary proof for the enterprise element of the Florida RICO statute was determined by the Supreme Court of Florida in *Gross, supra*.  There the court explained that there are at least two ways for an enterprise to be involved in criminal activity.  One is for individuals to use a legal enterprise to commit unlawful acts.  Another is the existence of an informal association of criminals who act with a common unlawful purpose.  In this case the Information charged the former -- that the co-defendants were "employed by, or associated with, an enterprise," First Montauk (ex. A), and carried out illegal acts under its umbrella.  The state then proved that the co-defendants used the legal entity of the First Montauk brokerage to carry out illegal sales to their mutual benefit.  Indeed, they could not have sold any investments without the umbrella of a licensed brokerage house, and that is exactly what they did.  That is sufficient for a conviction under the Florida RICO statute, as the state courts in petitioner's case and in *Black, supra*, held.

prosecuted for violation of the Florida RICO statute, Fla. Stat. § 895.03.[11]  As just discussed, the Florida First District Court of Appeal has advised that had counsel moved for a judgment of acquittal it would have been denied because the state's evidence was sufficient for a conviction under the Florida RICO statute.  Therefore, counsel was not ineffective for failing to move for a judgment of acquittal on this losing theory.

> **F.    Ineffective assistance of counsel - failure to raise double jeopardy defense.**

Petitioner next contends that he was subjected to double jeopardy and that his counsel was ineffective for failing to raise the defense.  He says that the two substantive counts contained the same elements, and that he could not be prosecuted twice for the same crime.  This issue was presented to the trial court in petitioner's motion for post-conviction relief and was denied.  The court held that each count contained different elements, and that there was no double jeopardy.  Specifically, the court held that the racketeering count required proof of an enterprise while the fraud count did not, and that the fraud count required an ongoing course of conduct with intent to defraud, while the racketeering count did not, but required only two instances of racketeering activity (ex. L, p. 103).  Thus, counsel would have accomplished nothing by raising the defense.  The Florida First District Court of Appeal affirmed.

"The Double Jeopardy Clause of the Fifth Amendment provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 306, 104 S.Ct. 1805, 1812, 80 L.Ed.2d 311 (1984).   This guarantee is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).  The Double Jeopardy Clause embodies three separate guarantees: "It protects against a second prosecution for the same offense after acquittal, against

---

[11]Fla. Stat. §  895.03(3) provides:

It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *Justices*, 466 U.S. at 307-08, 104 S.Ct. at 1812 (citation and footnote omitted).  In the contexts of both multiple punishment and successive prosecution, the double jeopardy bar applies if the two offenses for which the defendant is punished or tried cannot survive the "same-elements" or "*Blockburger*" test.  *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).   This test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Dixon*, 509 U.S. at 696, 113 S.Ct. at 2856.  Although this court will decide under federal law whether a double jeopardy violation has occurred, it must accept Florida courts' interpretation of that state's own statutes.  *Tarpley v. Dugger*, 841 F.2d 359, 364 (11th Cir. 1988) (citing *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983)).

_____The state court's interpretation of its own statutes is obviously correct. Although there were overlaps in the charges, each offense contained an element not contained in the other.  Thus, there was no successful double jeopardy argument to be made.  Counsel cannot be faulted for failing to move to dismiss or for a judgment of acquittal on this losing theory.  The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, when denying relief, and the writ should not issue.

      G.      <u>Ineffective assistance of counsel - failure to move for a *Frye* hearing.</u>

      Petitioner next contends that his counsel was ineffective in failing to ask the court for a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) in order to challenge the reliability of a state witness.[12]  Petitioner raised this claim in his motion for post-conviction relief, and the trial court denied relief, holding that the expert "based most, if not all, of his testimony on his experience as a bond expert"

---

[12]In federal courts *Frye* has been superceded by *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny, but *Frye* is still the law in Florida.  *Ramirez v. State*, 810 So.2d 836 (Fla. 2001).

(ex. L, p. 104), and noting that under Florida law a *Frye* hearing in not required for opinions of experts who testify based on their personal experience and training (*id.*).

In order to conclude that the state court unreasonably applied *Strickland*, this court would first have to conclude the state court misinterpreted state law.  Here, as in *Herring* and *Callahan*, the state court has advised how the issue would have been resolved under Florida state law had petitioner's counsel moved for a *Frye* hearing -- the motion would have been denied.  This court will not second-guess the state court on its resolution of the state-law issue.  Petitioner's counsel was not deficient for failing to submit a meritless motion.  The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, and the writ should not issue.

H.  <u>Ineffective assistance of counsel - advising petitioner not to testify.</u>

Petitioner next faults his counsel for bad advice on the issue of whether to testify at trial.  He says that his attorney should not have stuck with a "united we stand" defense, but should have allowed petitioner to testify, thereby disassociating himself from the others, and particularly from Mr. Black, who alone had dealings with Mr. Flowers.  Petitioner presented this claim in his motion for post-conviction relief, and the trial court denied relief.  It held that petitioner had conceded that his decision not to testify was a strategic one, but failed to allege that the strategy was an unreasonable one.  The court also noted that the claim was positively refuted by the record (ex. L p. 104).

In his reply brief petitioner makes much of a purported conflict of interest, in which counsel "insist[ed] that the petitioner not testify," and says that but for "counsel's advice and <u>coercive insistence</u>" on a united front, by which petitioner was "<u>overpowered</u> by counsel's <u>intimidating tactics</u>" and "<u>his misguided loyalties</u>," he would have testified (doc. 16, pp. 7-8) (emphasis in original).  These claims are not only without any foundation, they are specifically belied by the record.  During the trial the court, outside the presence of the jury, explained to all four defendants that they had the right to remain silent or to testify.  The court carefully explained the possible ramifications of either choice, and then asked each defendant individually, including this petitioner, whether his decision not to testify was his own personal

decision, not one that had been forced on him by counsel or anyone else. Petitioner assured the court that the decision not to testify was his own (ex. O, pp. 4864-67).

What petitioner told the court under oath is what he will have to live with. Petitioner's sworn testimony to the trial judge in open court is presumed to be truthful. In the context of a plea hearing, the Supreme Court has stated that "the representations of the defendant . . . at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). The same principle applies to other colloquies with the court. The defendant's representations are presumptively trustworthy and are considered conclusive absent compelling evidence showing otherwise. *Id*. In this case, petitioner told the trial judge that his decision not to testify was his own decision, not that he was overpowered by his attorney.

Moreover, what petitioner seems to say here is that because the "all together" defense did not work, it was a bad idea. Then, recognizing (as he must) that trial strategy, particularly one endorsed in open court by the petitioner, cannot be a basis for a successful ineffective assistance of counsel claim, petitioner tries to make a conflict of interest out of whole cloth. If petitioner felt that there was a conflict of interest and that he was coerced into remaining silent, he had every opportunity to say so when something could have been done about it. His current after-the-fact reconstruction of the facts is clearly refuted by his sworn testimony at trial, and is insufficient to sustain this claim. The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, when it denied relief on this issue.

I.    <u>Ineffective assistance of counsel - failure to move for dismissal of count two.</u>

Petitioner next contends that counsel should have moved to dismiss count two, the first substantive count, because he personally had no contact with Mr. Flowers, and therefore did not participate in any "pattern of racketeering" in Florida. Petitioner presented this issue in his motion for post-conviction relief, and the trial

court found that the appellate court had foreclosed the issue when it held in the *Black* case that the state had proven its case (ex. L, p. 106).

As in *Herring* and *Callahan*, the state courts here have determined how a motion for dismissal of count two would have been resolved under Florida state law had petitioner's counsel made such a motion -- it would have been denied. Therefore, counsel was not deficient for failing to submit it.  The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, and the writ should not issue.

> **J.**   **Ineffective assistance of counsel - cumulative effect of counsel's ineffectiveness.**

As his last ground based on ineffective assistance of counsel petitioner says that this court should grant him relief based on the cumulative effect of counsel's errors.  This claim was not presented to the state court for review, so it cannot be considered here.

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[13] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the

---

[13]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, *supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

An issue that was not fairly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734. This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.*

To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

_____Petitioner here has not responded to the respondent's assertion of failure to exhaust/procedural default other than to say that the cumulative errors of counsel merit relief (doc. 16, pp. 9-10). He fails to make any of the requisite showings to excuse his default. This court should therefore not consider the merits of this claim.

If the court were to overlook the procedural default, petitioner still would not be entitled to relief. Because, as to each of petitioner's ineffective assistance of counsel claims, there was no ineffectiveness, there can logically be no cumulative ineffectiveness, and petitioner is not entitled to federal habeas relief.

**GROUND TWO - Ineffective assistance of appellate counsel.**

For his second ground for relief petitioner contends that his appellate counsel was ineffective for failing to raise fundamental error at trial. Appellate counsel, he says, should have argued that petitioner was convicted of a non-existent crime. The thrust of his argument parallels the argument in his contention that the state failed to establish a prima facie case for a RICO violation because there was no criminal involvement on the part of the enterprise, First Montauk.

Petitioner filed a second petition for writ of habeas corpus to the appellate court (ex. P), in which he complained that appellate counsel should have argued the state failed to prove a shared purpose within the enterprise. The appellate court denied relief without discussion, stating only that the petition was denied "on the

merits."  **(Ex. Q).   Respondent asserts that this issue is procedurally defaulted because petitioner did not specifically point to a federal constitutional violation in presenting it to the state habeas court.**

**As previously discussed, a habeas petitioner must fairly present his federal claim to the state courts.  While the petitioner's pleadings in this case were less than perfect, there is no question that his claim to the state habeas court was based on "ineffective assistance of counsel."  In the opening paragraph of his state habeas petition, petitioner stated, "The basis for this petition is ineffective assistance of appellate counsel. . . ."  (Ex. P, p. 1).   Petitioner claimed that his counsel was ineffective on appeal for not raising certain issues.   As respondent concedes, petitioner cited the *Strickland* standard, arguing that "[a]ppellate counsel's error in failing to raise the fundamental error . . . was so serious that his performance fell below the *Strickland* objective standard of reasonableness and below the range of professionally accepted performance.  .  .  .  [A]ppellate counsel's deficiency compromised the appellate process to such a degree as to undermine confidence in the correctness of the result and but for such deficiency there is a reasonable probability that the outcome of the appeal would have been different."  (*Id.*, pp. 10-11).   Based on the foregoing, this court cannot say that petitioner failed to apprise the state court of the federal constitutional nature of his claim.   This claim is not procedurally defaulted, and is subject to review under § 2254(d).**

**<u>Clearly established federal law.</u>**

**The applicable federal law on this ground is *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 287-89, 120 S.Ct. 746, 765-66, 145 L.Ed.2d 756 (2000) (a claim of ineffective assistance of appellate counsel is governed by the same standard as that of ineffective assistance of trial counsel).**

**<u>Federal review of state court decision.</u>**

**This claim is essentially the same as that raised earlier (Ground 1 E), in which petitioner asserted that trial counsel was ineffective for failing to move for a judgment of acquittal on the grounds that the state did not prove the requisite *federal* elements sufficient to convict him under the *federal* RICO act.  And as before, the federal RICO Act, and federal cases construing it, is irrelevant.  The Florida**

courts have defined the contours of what must be proved for conviction under the Florida RICO Act, and have further held that the state met those requirements in this case. This court will not second-guess the state courts' interpretation of state law. *Herring, supra.* Just as trial counsel was not ineffective for failing to submit a losing motion, appellate counsel was not ineffective for failing to present a losing issue on appeal. The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, and the writ should not issue.

**GROUND THREE - Denial of due process.**

Petitioner claims his conviction violates due process in two respects: (A) no Florida nexus and (B) prosecutorial misconduct.

A.     Lack of Florida nexus.

Petitioner contends he was denied due process when he was convicted of committing a crime in Florida when there was no nexus between himself and anything that happened in Florida. This claim was presented to the appellate court in petitioner's direct appeal.

Clearly established federal law.

The commission of a crime in one state by a person residing in another state was first directly addressed by the Supreme Court in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911). In that case Mr. Daily, who resided in Illinois, contracted with a state official in Michigan to sell and deliver new machinery to the state. The machinery delivered was in fact used and worn, and Michigan sought to extradite Daily for prosecution for fraud. The Court held that extraditing Mr. Daily did not violate due process, holding that if the jury believed the allegations in the indictment, "the usage of the civilized world would warrant Michigan punishing him, although he never had set foot in the state until after the fraud was complete[,] because "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect . . . ." 221 U.S. at 284, 31 S.Ct. at 560. This is true even where the defendant/conspirator lives in a foreign country and all overt acts are performed in the charging district. *United States v. Winter*, 509 F.2d 975 (5th Cir.

1975).[14]  Similarly, a defendant can be prosecuted in Alabama for fraud, even though his only act is to fraudulently appraise and over-value land in California and then mail the appraisal to a corporation in Alabama. *Buffo v. Graddick*, 742 F.2d 592 (11th Cir. 1984) (approving denial of habeas relief where the claimed error was lack of jurisdiction by the Alabama court, and failure to prove all elements of the crime). <u>Federal review of state court decision.</u>

The state appellate court affirmed petitioner's conviction, referring to *State v. Black, supra*.  In the *Black* decision the court found that the Florida long-arm statute brought the conspiracy into Florida because part of the racketeering and scheme to defraud occurred in Florida.  Indeed, Florida's long-arm statute reaches any person who commits an act that results in a criminal wrong in Florida.  The statute parallels the statute involved in *Buffo, supra*.  The evidence established that this petitioner, along with others, conspired to defraud Escambia County, Florida, and shared in the resulting commissions, even though this petitioner did not himself have direct dealings with Escambia County.  As the Supreme Court held in *Strassheim v. Daily* and *United States v. Winter*, such a conviction does not violate due process.  The state court did not "unreasonably appl[y] the relevant Supreme Court authority," *Williams, supra*, and the writ should not issue.

B.     <u>Denial of due process - prosecutorial misconduct.</u>

Finally, petitioner contends that the prosecutor's actions, taken as a whole, were so egregiously prejudicial as to deny him a fair trial.  Respondent asserts this claim is procedurally defaulted.  In his direct appeal, petitioner claimed that the prosecutor committed numerous acts of misconduct, thereby depriving him of his right to a fair trial.  However, petitioner did not indicate that this claim was grounded upon the due process clause of the United States Constitution (ex. D pp. 52-56).  Indeed, his entire argument to the appellate court recited fourteen instances of alleged prosecutorial misconduct but cited no law in support, either state or federal.

---

[14]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Respondent says this makes a difference, since the Florida Constitution grants Florida's citizens the right to due process, Art, 1, § 9, Fla. Const., and petitioner did not put the state court on notice that he was making anything other than a state law-based claim. Respondent is correct. Petitioner's argument did not alert the state court to a possible federal constitutional violation, *Duncan v. Henry*, *supra*; *Zeigler v. Crosby, supra*, and it is too late for him to return to state court to do so. Petitioner has made none of the requisite showings to excuse his default. Therefore, this claim should not be considered by this court.

Even if the court were to consider the claim, it is without merit. It is long established Supreme Court law that prosecutors must refrain from improper methods calculated to produce a wrongful conviction; they may strike hard blows but are not at liberty to strike foul ones. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935). "A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused" and shall not "use arguments calculated to inflame the passions or prejudices of the jury." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citing Model Rules of Professional Conduct, Rule 3.4(e) (1984); Code of Professional Responsibility, DR 7-106(c)(4) (1980); ABA Standards for Criminal Justice: 3-5.8(b) (2nd Ed. 1980)).

In applying the various professional standards to the conduct of attorneys who appear before them, courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985) (quoting *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976)). "[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Id.* (citing *Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897)).

Challenges to allegedly improper prosecutorial comments are not infrequent. However, in evaluating a prosecutorial indiscretion:

> it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant

> question is whether the prosecutors' comments so
> infected the trial with unfairness as to make the resulting
> conviction a denial of due process.

*Darden, supra* (internal citations omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637,
94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Young*, 470 U.S. 1, 105 S.Ct.
1038, 84 L.Ed.2d 1 (1985).  Inappropriate prosecutorial comments, standing alone,
do not justify reversal of a criminal conviction obtained in an otherwise fair
proceeding.  Instead, the remarks must be examined within the context of the trial
to determine whether the prosecutor's behavior amounted to prejudicial error.
*Young,*  470 U.S. at 11, 105 S.Ct. at 1044.  In determining whether a prosecutor's
improper comments were so egregious as to render the proceeding fundamentally
unfair, the court will consider the remedying effects, if any, of the trial court's
instructions to the jury and the evidence of guilt.  *Cargill v. Turpin*, 120 F.3d 1366,
1379 (11th Cir. 1997).  Weight is also given to the trial judge's assessment of any
prejudicial effect the comments may have had.  *United States v. Simon*, 964 F.2d
1082 (11th Cir. 1992).

According to petitioner, there were fourteen instances in which the prosecutor
said and did things that caused defense counsel to object in front of the jury.
Additionally, there were more than 130 motions for mistrial, allegedly forced by the
prosecutor.   Petitioner contends this put the defendants in a posture which
discredited and prejudiced them in the eyes of the jury, and that it unfairly shifted the
burden of proof from the state to the defendants.  Petitioner has pointed to only a
few of the allegedly forced motions for mistrial, discussed below.  The trial transcript
is 5547 pages long.   If petitioner wants this court to review specific acts of
misconduct, he must point to them in the record.  The court is not required to look
for them.  As to the fourteen specific instances of prosecutorial misconduct,
petitioner detailed them in his direct appeal brief, and they are summarized as
follows:

1.     In opening statement the prosecutor referred to the county's cash flow
       problems, and  asked hypothetically "How many people do you want to
       lay off this month?" (ex. O, p. 963).  Objections to the statement were

sustained and motions for mistrial were taken under advisement (ex. O, pp. 963-67).

2.	In examining a witness the prosecutor adduced figures that made it appear that Escambia County had lost $22 million on its investments, when that figure was based on inadmissible hearsay and included the county's entire loss, not just that attributable to First Montauk. Counsel moved for a mistrial. The court gave a curative instruction and took the motion under advisement (ex. O, pp. 1338-43).

3.	The prosecutor then elicited testimony that the purported $22 million loss upset many of Mr. Flowers' staff. Counsel objected, again pointing out that the figures had not been admitted into evidence and were hearsay. The prosecutor indicated that the figures would indeed be admitted later. The court took the motions for mistrial under advisement and instructed the jury to disregard the earlier question and answer. The court then asked each juror to state on the record that they understood his instructions and would follow them, which they did (ex. O, pp. 1344-1362).

4.	Continuing improper questions by the prosecutor forced counsel to make continuing objections, which made the defense appear to be hiding something.

5.	The prosecutor adduced evidence from the county administrator that he effected a hiring freeze when the news of the losses became public. Counsel's objections were overruled. Motions for mistrial were taken under advisement (ex. O, pp. 1710-11).

6.	The prosecutor asked a question about commissions, which he had earlier proffered would not be asked. The court overruled the objections, holding that although the question was outside the proffer, it could have been handled by cross-examination and was harmless (ex. O, pp. 1997-2009).

7.	The prosecutor examined a witness about trips to Las Vegas by one or more of the co-defendants. Defense counsel's objections to relevance were overruled and motions for mistrial were taken under advisement (ex. O, pp. 2525-33).

8.	Defense counsel moved for mistrial because several times the prosecutor reminded a witness that she was under oath. The court took the motion under advisement (ex. O, 2557-61).

9.	The prosecutor made a lawyer joke, to which no objection was made. The next day defense counsel pointed out that he thought it was

unprofessional and represented yet another example of the prosecutor's misconduct.  The court's response was that the joke was not appropriate, but that it was not prejudicial (ex. O, pp. 2569-72).

10.    Defense counsel objected to evidence that had not been previously disclosed.  The motion for mistrial was taken under advisement (ex. O, pp.2639-43).

11.    The prosecutor handed a witness a transcript and identified it as such, rather than asking the witness to identify it.  Defense counsel's motion for mistrial was denied (ex. O, pp. 2963-65).

12.    Defense counsel objected and moved for mistrial when the prosecutor asked a witness if it would be a good thing if he lost $15 million of his client's money.  Counsel argued that the prosecutor was throwing large figures around to inflame the jury.  Various motions for mistrial were taken under advisement (ex. O, pp. 3349-54).

13.    The prosecutor asked a defense expert witness whether he believed what he was saying beyond a reasonable doubt.  The court sustained the objections and took the motion for mistrial under advisement (ex. O, pp. 4175-77).

14.    The prosecution asked a defense witness where certain tapes were, commenting that "I don't see them here."  Counsel moved for mistrial, asserting that this was a comment on the defendants' failure to put on evidence.  The court instructed the jury to disregard the comment, polling them as before, and took the motion for mistrial under advisement (ex. O, pp. 4242-45, 4250-51).

Toward the conclusion of the trial the judge noted that he had recorded approximately 130 motions for mistrial.  He stated that he would reserve ruling on them pending a jury verdict, and if the verdict was adverse to the defendants, he would review the trial transcript and rule on each one.  The jury returned a guilty verdict on all counts as to all defendants.  The motions were obviously denied, because the defendants were all adjudicated guilty and sentenced.  For the reasons that follow, the undersigned concludes that the fourteen instances of alleged prosecutorial misconduct did not render petitioner's trial fundamentally unfair, nor did the fact of the 130 "forced" motions for mistrial.

First, petitioner has presented no law to support his contention that there were so many instances of prosecutorial misconduct that their sheer number

requires federal habeas relief.   Second, the instances cited above are not so prejudicial as to have denied petitioner a fair trial.  They may have been hard hitting, but they were not so egregious as to render the proceeding fundamentally unfair. The trial judge sat through the entire twenty day trial.  He was able to observe the actions of the prosecutor, the defense attorneys, and the jurors.  When there were remarks that might have had a tendency to mislead the jury, a curative instruction was given.  In addition, the trial judge polled each juror individually, ensuring that each would abide by his instructions.  Some of the other instances dealt with alleged failure to produce documents, but all those claims were denied.   In many of the remaining instances the defense objections were overruled.  In the end, this court cannot say that there was prosecutorial misconduct so egregious that there is a reasonable probability that, in the absence of the improper conduct, the outcome would have been different.  *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988).

"[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *United States v. J Young, supra.*  Defense counsel argued vehemently and at length that the prosecutor was attempting at every turn to introduce inadmissible evidence, disobey court orders on limiting testimony, refuse to turn over documents, and commit similar prejudicial acts.  Claiming that this was happening, however, does not make it so.  The trial court after consideration denied all the motions for mistrial. Petitioner argues that because so many motions for mistrial were made, there must have been prosecutorial misconduct.  An equally logical conclusion would be that since all the motions were denied, defense counsel were overzealous in making objections.  Either way, petitioner has pointed to nothing in the record that had the ultimate effect of denying him a fair trial.

## CONCLUSION

The undersigned has examined the record in this case with care, and has considered each argument raised by petitioner.  The case was complex and difficult; the trial was lengthy; there were four defendants, each with counsel; emotions were high; and much was at stake.  Still, this court cannot say that the state court made

decisions on the issues raised here that were unreasonable in constitutional terms, that it failed to apply the appropriate federal standard as required, or that it unreasonably applied Supreme Court authority.   Moreover, in this court's view, counsel's performance was in no way ineffective, and the prosecutor's actions, while zealous, were not unconstitutionally prejudicial.

Accordingly, it is respectfully RECOMMENDED that the petition for writ of habeas corpus, (doc. 1) challenging the conviction and sentence in the case *of State of Florida v . David Eric Lynch*, in the Circuit Court of Escambia County, Florida, case no. 96-4261, be DENIED, and that this cause be DISMISSED and the clerk be directed to close the file.

At Pensacola, Florida this 9th day of February, 2006.


/s/ *Miles Davis*

**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**